UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEROY SUMMERS,

                Plaintiff,                    Case No. 4:15-cv-10550
                                            District Judge Linda V. Parker
v.                                    Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## RECOMMENDATION TO GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 12), DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 14) AND REMAND TO THE COMMISSIONER FOR FURTHER PROCEEDINGS

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Plaintiff's motion for summary

judgment (DE 12), **DENY** Defendant's motion for summary judgment (DE 14),

and **REMAND** the matter to the Commissioner for further proceedings consistent

with this Report and Recommendation.

**II.**    **REPORT**

       Plaintiff, Leroy Summers, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his application for supplemental security income.  This

matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 12), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 14) and the administrative record (DE 10).

### A.    Background

Plaintiff filed his application for benefits on August 29, 2011, at the age of 36.  (R. at 17 and 29.)  Plaintiff's application was denied and he sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ James M. Gramenos held three hearings: the first on September 14, 2012, the second on February 8, 2013, and the third on May 3, 2013.  On August 13, 2013, ALJ Gramenos determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 14-32.)   On December 17, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ Gramenos' decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

### B.    Plaintiff's Medical History

The undersigned has thoroughly reviewed Plaintiff's medical record.  In lieu of a lengthy summary of Plaintiff's medical history, I will provide a brief summary below and will make references and citations to the record as necessary in response to the parties' arguments.

### 1.   Physical Impairments

Plaintiff suffered from a gunshot wound to his right leg in 1996 or 1997.  (R. at 291.)  His primary physician, Dr. Leo Parsons, diagnosed him with chronic low back pain, a history of a gunshot wound to the right leg, post-traumatic stress disorder, COPD, hypertension, and anxiety.  (R. at 345.)  On April 26, 2012, Dr. M.I. Zahoor diagnosed Plaintiff with mild motor polyneuropathy.  (R. at 460-62.) He was examined by Dr. Charise Valentine on September 5, 2012.  (R. at 455-57.) Dr. Valentine noted that a nerve conduction velocity study suggested cervical radiculopathy.  (R. at 455.)

On September 11, 2012, Dr. Parsons explained that Plaintiff had a diagnosis of right lower extremity pain and chronic low back pain.  (R. at 419.)  He opined that Plaintiff would be able to work only two hours per day and assessed his pain as severe.

### 2.   Mental Impairments

Plaintiff suffers from major depressive disorder.  (R. at 416.)   He saw Dr. John Head on January 30, 2012, and reported that his symptoms of mental illness began when he was shot in 1997.  (R. at 415.)  Dr. Head prescribed Cymbalta, Desyrel, and Saphris.  (R. at 416.)  At his next visit, Plaintiff reported an improvement of his symptoms.  (R. at 414.)  His dosages were adjusted on June 28, 2012.  (R. at 413.)

### C.    Hearing Testimony

In this most unusual case, three separate hearings have been held, including a portion of one that took place *without the presence of Plaintiff or his counsel*.

### 1.    September 14, 2012

At the September 14, 2012 administrative hearing, Plaintiff testified that he was unable to work because he could not "sit still long enough" because of pains in his back.  (R. at 105.)  He further testified to pain in his right leg resulting from a bullet wound.  (R. at 106.)  Plaintiff indicated that his right leg pain and low back pain both rated as a seven out of ten with medication.  (R. at 107-108.)  Plaintiff further noted that he used a cane (prescribed by his treating physician) to help with walking because of the pain in his right leg.  (R. at 108.)

Plaintiff also testified to mental issues.  Specifically, when asked about his diagnosis of major depression, Plaintiff stated that he had "bad dreams," got very paranoid, and heard voices.  (R. at 109.)  He described himself as an emotional person and indicated that he gets easily frustrated and angry. (R. at 110.)  Plaintiff also noted that he had trouble concentrating because he felt like someone was "after [him]."  (Id.)  He noted that his medication is working better after a dosage adjustment.  (R. at 109.)

Plaintiff noted that his daily activities generally included sleeping a lot, watching television, and playing with his children.  (R. at 111-12.)  There was no

Vocational Expert ("VE") or Medical Expert ("ME") testimony at the September 14, 2012 hearing because the ALJ "didn't schedule either an ME or a VE," and instead scheduled such testimony to be heard on February 8, 2013.  (R. at 73.)

### b.   February 8, 2013

#### 1.   Medical Expert Testimony

Dr. Carl Leigh testified via telephone as the ME at the February 8, 2013 hearing.  (R. at 72.)  Dr. Leigh testified that he had sufficient time to review Plaintiff's medical record, Exhibits 1F through 15F (R. at 289-483), and described Plaintiff's severe impairments as mild obesity, mild degenerative joint disease at the right hip, and mild diffuse bulging of discs.  (R. at 74-75.)  He assessed Plaintiff's hypertension and asthma as non-severe.  (R. at 77.)

Plaintiff's attorney asked the ME why he did not consider his cervical radiculopathy as a severe impairment.  The ME answered that the relevant medical records were only suggestive of radiculopathy and not diagnostic of it.  (R. at 79.)

The ME then went on to describe Plaintiff's Residual Functional Capacity ("RFC").  He opined that Plaintiff was limited to lifting 15 pounds occasionally and ten pounds frequently, to standing and walking a maximum of three hours and sitting for six hours in an eight-hour workday, with no limitations on pushing and pulling.  He also noted that Plaintiff should avoid ladders, scaffolds, and unprotected heights but can occasionally climb ramps and stairs, and can stoop and

5

crouch.  He limited Plaintiff to frequently balancing, kneeling, and crawling.  (R. at 81.)  He also limited Plaintiff to frequent overhead reaching with the upper extremity and cautioned he should avoid concentrated exposure to extremes of temperature and humidity, along with respiratory irritants.  (R. at 82.)

Plaintiff's attorney asked how the ME could reconcile his opinion that Plaintiff could stand for three hours, when anyone who had personally examined Plaintiff limited him to two hours of standing.  (R. at 82-83.)  The ME answered that the limitation was based on his clinical interpretation of the evidence.  (R. at 85.)[1]

## 2.    VE Testimony

Immediately after the conclusion of the ME's testimony, the ALJ announced, "that closes the record, and it will be ready for decision . . . ."  (R. at 89.)  He then told the claimant, "I wish you well," excused the ME, and announced that they were "off the record."  (R. at 89-90.)  The hearing went off the record for an indeterminate amount of time.  When the hearing went back on the record, Elizabeth Pasikowski appeared via telephone to testify as the VE.  (R. at 90.)  By this time, Plaintiff and his counsel had already left the hearing.  (R. at 91.)  The

---

[1] At this point in the hearing, the ALJ chastised Plaintiff's counsel, Joshua Moore, asserting that Mr. Moore was being "argumentative again."  (R. at 86.)  Plaintiff's attorney asked several more questions and complained that the ME was not providing satisfactory answers.  (R. at 87-88.)  The ALJ however, concluded that the ME had satisfactorily answered counsel's questions.  (R. at 88.)

ALJ noted that he "neglected" to hold counsel in the room, "having forgotten that [he] had not taken the Vocational Expert testimony." (R. at 93.) Nevertheless, the ALJ examined the VE without counsel present.

The ALJ asked the VE to determine if a hypothetical individual could perform work at the unskilled, sedentary exertional level with the following restrictions:

- Frequently lift and/or carry weights up to ten pounds;

- Stand and walk for at least two hours in an eight-hour period;

- Sit for six hours in an eight-hour period;

- Understand, carry out, and remember simple instructions that do not require more than 30 days of training; and

- Remember simple, unskilled work instructions.

(R. at 94-96.) The ALJ also instructed the VE to eliminate jobs that have extremes of cold, heat, wetness, humidity, and high levels of dust, fumes, gases, odors, or similar environmental conditions and jobs with hazards in the work setting. (R. at 94-95.)

Based on this hypothetical, the VE identified three positions the hypothetical individual could perform: 1) assembler, with 2,700 positions in the Southeast Michigan region, 5,800 in the State of Michigan, and 182,000 nationally; 2) visual inspector, with 2,100 positions in the same region, 5,200 in the state, and 146,000

nationally; and 3) a hand packer, with 2,300 positions in the region, 5,400 in the state, and 152,000 nationally. (R. at 96-98.)

### c.   May 3, 2013

#### 1.   VE Testimony

On February 14, 2013, Plaintiff's counsel, Joshua Moore, informed the ALJ that he objected to the VE testimony given at the February 8, 2013 hearing, at which he was not present for cross examination. (R. at 186.) In addition, he asked the ALJ to recuse himself from the case, asserting that his "behavior and comments . . . show bias" toward Attorney Moore, which had interfered with the ALJ's objectivity toward his client. (Id.) On February 26, 2013, the ALJ acknowledged that counsel had a right to object to the testimonial opinion of the VE and scheduled a supplemental hearing. He refused to recuse himself, noting that because he had served "the Administration for periods in excess of twenty-four years as an administrative law judge, and an equal number of years as an attorney representing clients," he had "no bias toward [Attorney Moore]." (R. at 188.)

The supplemental hearing took place on May 3, 2013, at which Andrea Pellegrini, an attorney from Joshua Moore's law firm, represented Plaintiff. (R. at 37.) Carmine Abraham testified as the VE. For the first time, the ALJ clarified that Plaintiff's past relevant work was as a forklift operator. (R. at 43.) He then asked the VE an eleven-part hypothetical question to determine if the hypothetical

individual could perform Plaintiff's past relevant work or other work in the local or national economy.  Specifically, he asked the VE to consider the following hypothetical limitations:

- Ability to occasionally sit and/or stand with normal breaks for two hours within an eight-hour workday;

- Ability to engage in a sitting position for over six hours when performing work activity;

- Lifting abilities of at least ten pounds occasionally and up to ten pounds frequently;

- Eliminate from consideration jobs with extremes of cold, heat, wetness, or humidity;

- A work environment that does not allow for exposure to high levels of dust, fumes, gases, or similar environmental conditions;

- Eliminate from consideration jobs that have hazards in the work settings;

- Can speak and understand the English language;

- Has the basic mental abilities to understand, carry out, and remember unskilled work instructions that would take no longer than up to 30 days to learn;

- Has the functional ability to respond appropriately to supervision, co-workers, usual work restrictions, and deal with changes in a routine work setting;

- Restricted from performing work that is complex, detailed, and would require more than 30 days of training to learn the job duties; and

- Able to perform work that is simple, repetitive, and unskilled on a routine basis.

(R. at 44-46.)  Based on this hypothetical, the VE identified three positions the

hypothetical individual could perform: 1) surveillance monitor, with 21,168

positions in the state and 185,440 nationally; 2) bench assembler, with 20,270

positions in the state and 265,260 nationally; and 3) visual inspector, with 20,160

positions in the state and 434,170 nationally. (R. at 47-48.)

Upon questioning from Plaintiff's counsel, the VE testified that the positions

should not require any stooping and allow for alternating between sitting and

standing position.  (R. at 49.)  The VE further clarified that such alternating could

be performed every fifteen minutes outside of breaks in the surveillance monitor

position, but would be more difficult in the visual inspector and bench assembler

positions.  (R. at 50.)  The VE testified that the positions only require walking for

short distances and that bending is not an essential function of any  of the jobs.  (R.

at 51 and 52.)[2]  She also testified that the hypothetical individual could be off-task

for no more than ten percent of the time to remain competitive.  (R. at 51-52.)  The

VE noted that the jobs involve only lateral (and not overhead) reaching, with

occasional to rare interactions with co-workers.  (R. at 55.)

---

[2] Again, at this point in the hearing, the ALJ frequently interrupted Attorney
Pellegrini's questions, accusing her of "not framing [her questions] with some
specific individual called a hypothetical individual."  (R. at 53-54.)

### 2.      Plaintiff's Testimony

Plaintiff testified that his leg and back prevented him from working, along with his mental conditions, including paranoia, nervousness, and hallucinations. (R. at 56-57.)  He indicated that he could only stand for about ten minutes before needing to rest, and could only sit for ten minutes before needing to stand up.  (R. at 57-58.)  He noted that he napped daily for about two hours.

Plaintiff testified that he had memory problems, forgetting appointments and medicine, and that his wife had to help him with "basically everything."  (R. at 58.) He noted that his wife took care of all of the housework.  (R. at 58-59.)  He said his concentration was "bad" and that he avoided spending time with other people.  (R. at 59.)

### D.  THE ADMINISTRATIVE DECISION

On August 13, 2013, the ALJ issued his decision.  (R. at 14-32.)  At Step 1 of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?
2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

in substantially gainful activity since her application date of August 18, 2011.[4]  (R. at 17.)

At Step 2, the ALJ found that Plaintiff had the severe impairments of: status post year 1997 gunshot wound right hip; right-hip mild degenerative change superior-lateral aspect hip joint; mild lower extremity polyneuropathy; obesity; asthma; major depressive disorder, recurrent; anxiety; and history of illegal substance and tobacco abuse.  (R. at 17.)

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 18.)

Prior to Step 4 of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[5] and determined that Plaintiff had the

---

4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

See 20 C.F.R. §404.1520(a)(4); see also Henley v. Astrue, 573 F.3d 263, 264 (6th Cir. 2009); Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001).

[4] There is some confusion as to why he chose this date.  His opinion states that at the May 3, 2013 hearing, Plaintiff "amended the claimed onset date from March 27, 1997 to August 18, 2011.  (R. at 30.) Yet the hearing testimony shows that the ALJ amended Plaintiff's alleged onset date to November 2, 2011 during the hearing.  (R. at 63 and 68.)

capacity to perform a full range of unskilled sedentary work.  (R. at 20.)  The ALJ concluded that Plaintiff was unable to perform his past relevant work.  (R. at 29.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy.  (R. at 29-32.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.

### E.  STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

---

[5] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability."  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its

own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting

*Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F. ANALYSIS

Plaintiff asserts two statements of error. First, he contends that the ALJ

committed reversible error by failing to account for Plaintiff's physical

impairments and treatment in the RFC. Second, he argues that the ALJ failed to

provide him with a full and fair hearing in front of an unbiased ALJ. The

Commissioner opposes Plaintiff's motion, asserting that the ALJ's opinion is

supported by substantial evidence. I will consider each of the arguments in turn.

### 1.    Plaintiff's RFC is Supported by Substantial Evidence.

Plaintiff's RFC is "the most [he or she] can still do despite the physical and

mental limitations resulting from [his or] her impairments." *Poe v. Comm'r of

Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§

404.1545(a), 416.945(a). The determination of Plaintiff's RFC is an issue reserved

to the Commissioner and must be supported by substantial evidence. 20 C.F.R. §§

404.1527(3), 416.927(e). '"ALJs must not succumb to the temptation to play

doctor and make their own independent medical findings.'" *Simpson*, 344 F.

App'x at 194 (6th Cir. 2009) (quoting *Rohan*, 98 F.3d at  970).

Pursuant to Social Security Rule 96-8p, the RFC assessment must include:

> [A] narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *6-7. "Although SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002). Instead, the ALJ "'need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (quoting *Bencivengo v. Comm'r of Soc. Sec.,* No. 00–1995, 251 F.3d 153, slip op. at 5 (3d Cir. Dec. 19, 2000).

### a.    Plaintiff's Use of a Cane

Here, Plaintiff asserts that the ALJ failed to properly describe the limitations caused by his severe impairments. First, he argues that, while the ALJ acknowledged his use of a cane, he discounted that use without relying on the medical evidence in the record. Defendant counters that the ALJ discounted

Plaintiff's need for the cane by relying on the opinion of Dr. Bina Shaw, who observed that Plaintiff was able to walk with a steady gait without his cane. (R. at 327-324.)

Plaintiff's position in this respect is unavailing. The ALJ based his rejection of Plaintiff's use of a cane on the opinion evidence provided by consultative examiner Dr. Shaw. (R. at 22.) Dr. Shaw specifically opined that Plaintiff was "able to walk and has full range of motion of the right knee and hip" (R. at 329) and that he was able to walk around the appointment without a cane (R. at 333). Although Dr. Shaw's opinion in some ways conflicts with the opinion of Plaintiff's treating physician Dr. Parsons, the ALJ properly discounted Dr. Parson's opinion that Plaintiff is unable to work at any job and Plaintiff does not challenge that conclusion. Likewise, Plaintiff does not challenge the ALJ's assignment of "limited evidentiary weight" to Dr. Parson's opinions generally, based on the adjudicator's observation that these opinions were "dominantly conclusory . . . without objective medical evidence to support" them. (R. at 22.)

### b.   Limitation to Unskilled Work

Plaintiff's second argument is also unsuccessful. He asserts that the ALJ failed to account for his moderate limitations in concentration, persistence, and pace ("CPP") by limiting him to unskilled work. While there is some support for the proposition that the limitation to unskilled work fails to adequately account for

a moderate limitation in CPP, *see, e.g, Bielat v. Comm'r of Soc. Sec.*, 267 F. Supp. 2d 698, 702 (E.D. Mich. 2003), there is also conflicting support to refute this position. I find particularly persuasive the reasoning in *Bohn-Morton v. Commissioner of Social Security*, 389 F. Supp. 2d 804, 805-07 (E.D. Mich. 2005), which emphasizes the need for a case-by-case analysis and concludes that a limitation to unskilled work adequately accounts for a moderate deficiency in CPP. *See also Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010)(noting that "[d]ecisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work."); *Schalk v. Comm'r of Soc. Sec.*, No. 10-CV-13894, 2011 WL 4406824, at *11 (E.D. Mich. Aug. 30, 2011) *report and recommendation adopted*, No. 10-13894, 2011 WL 4406332 (E.D. Mich. Sept. 22, 2011)(concluding that there is "no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of "unskilled work" but excludes a moderate limitation in concentration" and holding that, instead, the "Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC.").

I conclude, based on the record as a whole, that the ALJ's limitation to unskilled work is sufficient to address Plaintiff's moderate difficulties in CPP. Specifically, the ALJ did more than limit Plaintiff to unskilled work. His

18

hypothetical to the VE clarified that the hypothetical individual was "restricted from performing work that is complex, detailed, and would require more than 30 days of training" and clarified that the work must be "simple, repetitive, and unskilled" on a sustained basis.  (R. at 46.)  Such a conclusion is supported by substantial evidence in the record, including the opinion of consultative examiner David L. Hayter, Ph.D., who opined that Plaintiff was able to "understand, retain and follow simple instructions" and could perform "simple, routine, repetitive, concrete, tangible tasks."  (R. at 338.)  Accordingly, the ALJ did not err in this respect.

### c.    Compliance With SSR 96-7p

Plaintiff next asserts that the ALJ failed to evaluate the factors set forth in SSR 96-7p[6] when assessing his subjective complaints. SSR 96-7p sets out the following factors for an ALJ to evaluate, in addition to the objective medical evidence, when determining the credibility of the claimant's statements: 1) daily activities; 2) location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) type, dosage, effectiveness, and side effects of medication; 5) treatment other than medication; 6) measures other than treatment the individual uses to relieve pain or other

---

[6] Of note, SSR 96-7p has been superseded since Plaintiff filed his brief.  *See* SSR 16-3p, effective March 28, 2016.

symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. The ruling also notes that "[a]n individual's statements about the intensity and persistence of pain or other symptoms . . . may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p.

As an example, Plaintiff asserts that the ALJ "seemingly dismisses" the opinion of treating psychiatrist, John Head, D.O., as contradicted by a global assessment functioning ("GAF")[7] score of 48. (DE 12 at 12.) Plaintiff takes issue with the ALJ's citation to *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007), for the proposition that a GAF of 48 does not preclude work activity. Plaintiff asserts that the *Smith* decision does not state that GAF scores are a determinable factor in assessing disability. While that is true, the *Smith* decision does state that "[e]ven assuming GAF scores are determinative, the record supports

---

[7] The GAF scale was used to report a clinician's judgment of an individual's overall level of functioning. Clinicians selected a specific GAF score within the ten-point range by evaluating whether the individual was functioning at the higher or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR). A GAF score of 41-50 was indicative of serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR at 34. However, "the most recent version of the DSM does not include a GAF rating for assessment of mental disorders." *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL 1328277, at *10 (E.D. Mich. Mar. 28, 2014).

a GAF in the high 40s to mid 50s, which would not preclude her from having the

mental capacity to hold at least some jobs in the national economy." *Id.* This is

not inconsistent with the ALJ's analysis. Nor does the ALJ indicate that he

discounted Dr. Head's opinion in its entirety simply because of the GAF

assessment. The Sixth Circuit has held that a GAF score "is not dispositive of

anything in and of itself, but rather only significant to the extent that it elucidates

an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 F.

App'x 681, 684 (6th Cir. 2011). Instead, he also points to Dr. Head's notes that

Plaintiff demonstrated good grooming, timeliness, orientation times four, good eye

contact, normal speech, intact judgment, and a logical and coherent thought

process. (R. at 416.) He never made any indication that Plaintiff's mental

impairments were work preclusive. Accordingly, Plaintiff's argument with respect

to the ALJ's treatment of the GAF is unavailing.

Defendant also counters that the ALJ did discuss all of the factors in his

analysis. Specifically, Defendant notes that the ALJ did discuss Plaintiff's pain,

asthma, and high blood pressure (R. at 21), allegations by his friend that he cannot

lift ten pounds (R. at 21), objective medical evidence (R. at 21-22), his prior work

record (R. at 29), and Plaintiff's activities of daily living (R. at 19). The ALJ also

found Plaintiff's subjective complaints were not fully credible, and Plaintiff does

not challenge this finding. (R. at 28.) Furthermore, "'an ALJ is not required to

discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467-68 (6th Cir. 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Thus, there is no indication that the ALJ erred in this respect.

Accordingly, based on the record as it stands, it appears that Plaintiff's RFC is supported by substantial evidence. However, based on the potential bias discussed below, I recommend that this entire matter be remanded for a new hearing in front of an ALJ other than ALJ Gramenos.

### 2.    Bias and Failure of Due Process

Plaintiff also asserts that he is entitled to remand because he did not receive a full and fair hearing in front of an impartial judge, in violation of 20 C.F.R. § 404.927 and the Due Process Clause of the United States Constitution. Plaintiff explains that his attorney had a pending judicial misconduct claim against the ALJ during the time of Plaintiff's hearings. During the hearings, he contends that the ALJ would not allow him to question the ME, closed the hearing early, and questioned the VE without the presence of Plaintiff's counsel. He also points out the "diatribe" against his counsel that the ALJ made on the record during the hearing, and notes that he asked the ALJ to recuse himself after the second hearing. (DE 12 at 14.) Finally, Plaintiff informs the Court that his counsel has stopped

appearing before ALJ Gramenos because the ALJ told his colleagues that Mr. Moore was "not welcome in his courtroom." (DE 12 at 15.)

Defendant contends that Plaintiff has failed to provide convincing evidence of bias in the instant matter. Specifically, Defendant notes that the ALJ's interruptions were not enough to show bias, relying on *Wells v. Apfel*, 234 F.3d 1271 (table) (6th Cir. 2000) for the proposition that an ALJ's expression of frustration of counsel's cross examination did not "defeat the fact that none of Plaintiff's doctors said that he could not work." *Id.* at *6. Here, however, Plaintiff's examining doctors *did* say he could not work. (*See, e.g.*, R. at 325, in which his treating physician Dr. Parsons opines that Plaintiff cannot work at any job.) Furthermore, the *Wells* case does not contain the added fact that counsel had a pending misconduct charge against the ALJ at the time of the hearing.[8] Finally, the Plaintiff in *Wells* failed to exhaust his administrative remedies by asking the ALJ to withdraw from the case. Here, the ALJ was asked to recuse himself. (R. at 186.)

Defendant also asserts that Plaintiff was not prejudiced by the ALJ's failure to have a VE at the first hearing and failure to question the VE in the presence of Plaintiff's counsel at the second hearing, because Plaintiff's counsel was able to

---

[8] Plaintiff's counsel reports the "actively pending" grievance, but does not supply any verification of this for the record. (DE 12 at 14.) Similarly, he offers to, but does not, supply examples of ALJ Gramenos' complaining about him to his colleagues at hearings in other cases. (Id. at 14-15.)

cross examine a substitute VE at the third hearing, and the ALJ relied only on that VE's testimony.  However, the ALJ's actions in this case unnecessarily prolonged the entire procedure, and required the presence of Plaintiff and his counsel at three separate hearings over nearly eight months.

Moreover, I am extremely troubled by the *ex parte* testimony received at the February 8, 2013 (second) hearing after the record had clearly closed and the ALJ had wished Plaintiff well and sent him on his way.  (R. at 89-90.)  The ALJ later tried to blame Plaintiff's counsel by unfairly characterizing the sequence of events as if he had abruptly "walked out" (R. at 27, 39, and 92), even though the ALJ admitted at the time that "*my neglect* is not holding counsel here and *having forgotten* I had not taken the Vocational Expert testimony.  (R. at 93.) (emphasis added). The social security regulations state that "[t]he administrative law judge may ask the witnesses any questions material to the issues and *shall allow* the parties or their designated representatives to do so."  20 C.F.R. § 404.950(e) (emphasis added); *see also Haddock v. Apfel*, 196 F.3d 1084, 1090 (10th Cir. 1999) ("[c]laimants have a right to cross-examine vocational experts as a part of procedural due process.") (internal citation omitted).  No amount of retrospective record-making and casting of aspersions on Attorney Moore by the ALJ (*see* R. at 25-29, 39-41, 60-61, and 91-93) can cure the obvious violation of due process that occurred here, nor am I convinced, despite the ALJ's self-protective protestations

to the contrary, that the *ex parte* VE testimony from the second hearing was simply relegated to the dust heap of "do over" testimony and ignored. (R. at 41.). After an error of this magnitude, the Commissioner may not simply "take a mulligan."[9] *See, e.g., Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994) (admonishing the Commissioner to do away with a policy allowing a VE to testify in the absence of the claimant and remanding the matter for rehearing.)

Pursuant to 20 C.F.R. § 404.940, an ALJ "shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." *See also* 20 C.F.R. § 416.1440. Parties are instructed to notify the ALJ of any objections to his or her service at the earliest opportunity, and the ALJ then "shall decide whether to proceed with the hearing or withdraw." Id. The United States Supreme Court has recognized the right to an unbiased ALJ, explaining that "[a] fair trial in a fair tribunal is a basic requirement of due process" and that "[f]airness of course requires an absence of actual bias in the trial of cases. *In re Murchison*, 349 U.S. 133, 136 (1955). The ALJ also has a duty to fully and fairly develop the record. *Lashley v. Sec. of Health & Hum. Servs.*, 708 F.2d 1048 (6th Cir. 1983). "When a claimant is not given a full and fair trial, remand before a different ALJ is an appropriate remedy." *Fluker v.*

---

[9] I am likewise troubled by the ALJ's repeated complaints on the record about his staff, the Commissioner's backwards technology, and the like, but this is less likely to have been outcome determinative. (R. at 65-67, 73, and 90.)

*Comm'r of Soc. Sec.*, No. Civ-12-10612, 2013 WL 1122876, at*9 (E.D. Mich. Feb.

11, 2013) *report and recommendation adopted in relevant part* No. 12-10612,

2013 WL 1122447 (E.D. Mich. Mar. 18, 2013) (citing *Ventura v. Shalala*, 55 F.3d

900, 903-905 (3d Cir. 1995)).

 In assessing accusations of bias, the Court "must begin with the

'presumption that policymakers with decisionmaking powers exercise their power

with honesty and integrity.'" *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358,

363-64 (6th Cir. 2004) (quoting *Navistar Int'l Transp. Corp. v. EPA*, 941 F.2d

1339, 1360 (6th Cir. 1991)). "The burden of overcoming the presumption of

impartiality rests on the party making the assertion of bias, and the presumption

can be overcome only with convincing evidence that a risk of actual bias or

prejudgment is present." *Navistar*, 941 F.2d at 1360 (internal quotations omitted).

 A review of the motions, the administrative record, the Code of Federal

Regulations, and the relevant case law reveals that Plaintiff was denied a full and

fair hearing before an unbiased ALJ. As a preliminary matter, the Commissioner

does not dispute the fact that Plaintiff's counsel had a pending judicial misconduct

complaint against ALJ Gramenos at the time of Plaintiff's hearing. Defendant

does not explain how a pending judicial misconduct complaint is not an example of

potential prejudice toward Plaintiff and his counsel. Nor does Defendant explain

how any potential prejudice toward Plaintiff was mitigated.

Furthermore, the record contains troubling instances in which the ALJ either belittled or interrupted Plaintiff or his counsel, or in which he mischaracterized Plaintiff's testimony.  For example, the ALJ began the September 14, 2012 hearing, inexplicably, by noting that Plaintiff's voice was "so low" that he thought he was a foot shorter than his actual height.  (R. at 104.)  Additionally, the ALJ chastised Plaintiff's attorney for not being specific enough in his questions.  (R. at 105.)  Then during counsel's questioning of his client, the ALJ repeatedly interjected so as to interrupt the flow of the examination, for example:

> ALJ:  Which pain are you talking about now, the leg or the back, counsel?
>
> ATTY: The leg.
>
> ALJ:  Pardon?
>
> ATTY: I – he was describing the leg pain, Your Honor.
>
> ALJ:  No. You asked him questions, and he talked about the right leg, chronic pain. Then he said his back hurts.
>
> ATTY: All right.
>
> ALJ: And then you asked a question –
>
> CLMT: *Not at all*. (emphasis added)
>
> ALJ:  – and I don't understand.

(R. at 106.)

This exchange and others like it leads to a potentially more troubling issue: the ALJ's treatment of Plaintiff's counsel in this matter, in which he prevents counsel from fully developing the record. *See Fluker*, 2013 WL 1122447, at *4 (adopting the Magistrate Judge's recommendation for remand where the record contained "a number of examples of the ALJ preventing Plaintiff's counsel from fully developing the record."). Here, the following occurred during the February 8, 2013 hearing when Plaintiff's counsel Joshua Moore was attempting to cross examine the ME:

> Q.   Well, you're also disagreeing with both consultative examinators [sic] who have interviewed the—have actually seen the client, Mr. Summers, as well as the treating physician. So how do you explain that?
>
> ALJ:  You want to take them one at a time or –
>
> ATTY: No. I want to ask him the question
>
> ALJ: All three?
>
> ATTY:  I'm asking—he's disagreeing with every doctor who[] examined him.
>
>      *   *   *
>
> ALJ: Do you agree? You're asking three. Be specific.
>
> ATTY: I'm, I'm—I don't know you—I can't follow you so.

(R. at 83-84.)  The ME attempted to answer the question, but when counsel asked for a clarification, the ALJ interrupted and cautioned counsel not to interrupt. (R. at 84.)  The ALJ then told counsel to move on with his questions ("Next question,

counsel"), despite counsel's accurate assertion that his "question wasn't

answered."  (R. at 85.)

In response to counsel's request for clarification as to how the ME

interpreted the clinical findings in the record, the ALJ stated the following:

ALJ: Sir, as a lawyer, why would you want a medical education?

ATTY: I'm asking for a—he said earlier that as related to 15F, page 36, that he's the one who stated that it needed clinical interpretation. So I'm asking him what that means. That's a very fair question in this courtroom.

ALJ: Well I could answer that for you.

ATTY: Well, answer it if, if you—

ALJ: But I'm not going to.

ATTY: --want to testify, Your Honor, that would be great.

ALJ. No, I'm not going to testify.

ATTY: Well, you are. You might as well.

*            *            *

ALJ: You're arguing. That's happened last at the hearing. There's a recording—

ATTY: What's the definition?

ALJ: Oh, please.

ATTY: Are you going to allow—

ALJ: You have a physician. His resume is in the file. You want to attack his credibility?

ATTY: Yeah, I, I do.

ALJ: Well do so by specifics.

ATTY: I'm asking him if he stated what his clinical interpretation, what is that, what is the definition?

ALJ: No.

(R. at 85-86.)  Only with extraordinary effort did Counsel later manage to have his question answered.  (R. at 87.)

Finally, the ALJ chastised counsel for interrupting the ME, concluding that counsel's questions had been answered despite counsel's frequent complaints that the questions had not been answered.  (R. at 88.)  And yet, to this Court, it appears that Counsel was simply trying to conduct a meaningful cross-examination of a non-responsive witness, but was unjustly and repeatedly taken to task by the ALJ for fairly plying his trade.

Then, the ALJ took the case off the record, and came back on the record with a VE testifying by telephone, but without Plaintiff or his counsel.  (R. at 90.) At the beginning of this portion on the hearing, the ALJ goes on a lengthy narrative discussion about counsel's interruptions.  (R. at 91-93.)

At the final hearing, Plaintiff was represented by Andrea Pellegrini, another attorney from Joshua Moore's law firm.  During that hearing, the ALJ acknowledged Attorney Moore's request that he recuse himself, and noted that he

30

did not do so because the request only contained allegations of bias against

Attorney Moore, and not against Plaintiff himself.  (R. at 42.)  During Attorney

Pellegrini's cross examination of the VE, the ALJ again belittled Plaintiff's new

representative, and frequently objected to the form of her questions because she did

not phrase it in the form of a hypothetical individual but instead did what he

described as "asking discovery questions."  (R. at 50-53.)  For example, the

following exchange occurred:

> ALJ:  Once you cut anybody off, if I cut you off, then suddenly the recording just causes a big block where nobody knows who did what. Have I made my position clear? If not, I just have to put up with whatever you want to do.  Proceed.
>
> ATTY: Ok. The hypothetical person. Would a hypothetical person—
>
> ALJ:  Well, now you again said would.
>
> ATTY: Okay.
>
> ALJ:  Make it specific.  Let me read this to you.  When the form of a question as presented to the VE absent specific mental or physical functional limitations, how is a person to respond other than in a textbook fashion where you're trying to gain information and not personalizing it for a specific case. . . .
>
> ATTY: Okay.
>
> ALJ: So stop cluttering with data that may not be relevant to your client's case. I did say do whatever you want.

 (R. at 53-54.)  While taken in isolation, some of the colloquy may seem like fair

direction or criticism, the Court "does not evaluate each comment in isolation" but

instead examines "'the evidence in the record taken as a whole.'" *Fluker*, 2013 WL 1122447 at *4 (quoting *Wyatt v. Sec'y of Health & Hum. Servs.*, 974 F. 2d 680, 683 (6th Cir. 1992 )).  Here, reviewing the record as a whole, the overall effect of the ALJ's caustic and ongoing interruptions of cross-examination was disruptive and disrespectful.  Disconcertingly, the manner in which the ALJ conducted these hearings deprived Plaintiff of his Constitutional right to due process.

Finally, although it is not dispositive, ALJ Gramenos has been admonished several times by this Court for similarly failing to afford claimants a fair and impartial hearing.  *See Fluker*, 2013 WL 1122447, at *5 (remanding a case for bias and Due Process violations where the record contained "a number of examples of [ALJ Gramenos] preventing Plaintiff's counsel from fully developing the record, by either cutting off lines of questioning, or by chastising Plaintiff's counsel for attempting to introduce further medical evidence."); *Washington v. Comm'r of Soc. Sec.*, 1996 U.S. Dist. LEXIS 16233 (E.D. Mich. June 6, 1996); *Schenburn v. Comm'r of Soc. Sec.*, No. 95-cv-70920, 1996 WL 426534 (E.D. Mich. Jan. 31, 1996).  This case seems to fit within the same unfortunate pattern. Based on all of the above, I conclude that Plaintiff has overcome the presumption of impartiality by providing convincing evidence that a risk of actual bias, the substantial appearance of bias or prejudgment is present.  Even if this were not so, I further

32

conclude that, standing alone, the ALJ's receipt of expert testimony after Plaintiff and his counsel had apparently been excused from the hearing, deprived this claimant of the due process to which he was entitled.  Accordingly, I recommend that the matter be remanded for a *de novo* hearing before and opinion by a different ALJ.

### G.  CONCLUSION

I am not troubled by the ALJ's *reasoning* in his opinion *per se*; however, I seriously question the manner and procedure by which he obtained the evidence and created the record to support his reasoning. The *process* was faulty on its face, and accordingly, neither provided "due process," nor gave the appearance of being administered by a fair and impartial tribunal. As such, Plaintiff was not afforded a full and fair hearing.  *See Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) ("'The fundamental requisite of due process of law is the opportunity to be heard.'") (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)).  Accordingly, I **RECOMMEND** that Plaintiff's motion for summary judgment be **GRANTED**, that Defendant's motion for summary judgment be **DENIED**, and that, pursuant to 42 U.S.C. § 405(g), the case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation, including a *de novo* hearing before and opinion by a different ALJ.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.


Dated: June 2, 2016                          s/Anthony P. Patti
                                             Anthony P. Patti
                                             UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of this document was sent to parties of record on June 2, 2016, electronically and/or by U.S. Mail.

                                             s/Michael Williams
                                             Case Manager for the
                                             Honorable Anthony P. Patti